**UNITED STATES of America**

v.

**Frederick F. FADAYINI, Appellant.**

**UNITED STATES of America**

v.

**Fatai A. GAFARI, Appellant.**

**Nos. 91–3267, 91–3268.**

United States Court of Appeals,
District of Columbia Circuit.

Argued May 13, 1994.

Decided July 15, 1994.

Rehearing Denied Sept. 16,
1994 in No. 91–3268.

William J. Garber, Fairfax, VA, (appointed by the court), argued the cause, and filed the briefs, for appellant Gafari.

On the briefs, for appellant Fadayini was Gregory Burr MacAulay, Washington, DC (appointed by the court).

Linda I. Marks, Asst. U.S. Atty., Washington, DC, argued the cause, for appellee. With her on the brief were Eric H. Holder, Jr., U.S. Atty., and John R. Fisher, Roy W. McLeese, III and Thomas E. Zeno, Asst. U.S. Attys., Washington, DC.

Before: MIKVA, Chief Judge, BUCKLEY and ROGERS, Circuit Judges.

Decision of the Court filed by Chief Judge MIKVA.

MIKVA, Chief Judge:

Appellants appeal their respective convictions and sentences for bank fraud and access device fraud. We affirm. We write principally to express a concern about the nature of the admitted expert testimony and to clarify a point about departure under § 5K2.0 of the Sentencing Guidelines.

## I. BACKGROUND

Appellants each were indicted on four counts of bank fraud (18 U.S.C. § 1344) and one count of access device fraud (18 U.S.C. § 1029) for the unauthorized withdrawal over one weekend in February, 1989 of approxi-

mately $78,000 from D.C.-area automatic teller machines ("ATMs"). After a jury trial before Judge Gesell, appellants were convicted on July 16, 1991 on three of the four bank fraud counts and the access device fraud count. Judge Gesell sentenced Gafari and Fadayini to 37 and 30 months' incarceration, respectively, under the United States Sentencing Guidelines and to three years of supervised release. Appellants now challenge their convictions and sentences.

Central Trust, a Cincinnati-based bank, issues "Affinity" Mastercards which can be used to obtain cash in ATMs connected to the "CIRRUS" network. In 1988, Central Trust received and approved an Affinity card application in the name of Martha Hunt. It issued a card in that name and sent it to the Washington, D.C. address indicated on the application. It later received a change of address form indicating a forwarding address, also in the District of Columbia.

In June, 1989, the United States Secret Service informed Central Trust that it was investigating the possible fraudulent use of the Martha Hunt Affinity card. The FBI located Cherline Wilkinson, a prior occupant of the apartment listed on the card application. Wilkinson revealed that she had allowed appellant Fadayini to use the address to receive mail at the time the Martha Hunt application was submitted. She supplied a photograph of Fadayini. The investigators also contacted the banks at which Central Trust's records indicated the Martha Hunt card had been used, and obtained ATM photographs from two of those banks—Riggs and First American—for the relevant days and times. The investigators believed appellants to be the two individuals shown in the ATM photographs. FBI fingerprint experts analyzed the change of address cards sent to both Central Trust and the local post office, finding latent prints belonging to Fadayini on each. FBI agents arrested appellants based on this and other information.

The government presented a number of witnesses at trial. FBI and Secret Service agents and Cherline Wilkinson testified to the facts described above. The real Martha Hunt testified that although her name, date of birth, and social security number were correctly listed on the application, she did not fill out or sign the application; she had not authorized anyone to do so on her behalf; she had never lived at the addresses listed on either the application or on the change of address form; and she did not know either appellant. Ms. Hunt also testified regarding her credit difficulties that resulted from the fraudulent use of the card bearing her name.

Mr. Nienaber, an assistant vice-president at Central Trust, testified concerning the bank's ATM logs which reflected the transactions involving the Martha Hunt card. Keepers of records and/or security officers at each of the four banks at which the Martha Hunt card was used testified regarding the times the card was used and the manner in which the banks' ATMs and surveillance cameras operate. The government introduced a number of ATM photos from First American Bank and Riggs Bank. No photos were introduced from Signet or Crestar, the other two banks at which the Martha Hunt card was used.

Secret Service Agent Byers (who had booked appellants) identified appellant Fadayini in thirteen of the ATM photos. After counsel for Mr. Gafari objected to the identifications, the court qualified Agent Byers as an expert witness in the identification of individuals from photographs. The basis for Agent Byers' qualification as an expert was that his Secret Service duties included reviewing photographs of potential troublemakers prior to protective assignments and then identifying those individuals if they appeared in crowds. Byers proceeded also to identify Gafari in a number of the ATM photographs.

Finally, Secret Service Agent John Kirkwood testified as a summary witness. He cross-referenced the withdrawals reflected in Central Trust's logs with those on the individual banks' ATM logs, noting slight discrepancies between the two. He also matched the ATM photographs to the transaction logs, again noting minor discrepancies. Agent Kirkwood testified that the Martha Hunt card was used to withdraw a total of $78,000 between February 10 and February 12, 1989.

After the government's case-in-chief, appellants moved for acquittal, which was denied. The defense presented no evidence. The jury convicted both appellants of the three bank fraud counts involving First American, Riggs, and Crestar, and the access device fraud count. Each was acquitted of the Signet count.

At the September 13, 1991 sentencing hearing, the government presented additional evidence of credit card abuse by both appellants. Agent Kirkwood testified that on April 18, 1989, appellants were arrested at Bloomingdale's for the use of three stolen credit cards. Gafari was apprehended outside the store attempting to bury the cards. Agent Kenny testified that appellants co-owned a clothing boutique called Gaf–Fad, and that the store's merchant bank, Peachtree Bank, reported that eight fraudulent credit cards had been used to charge merchandise at the store totalling some $23,000. Peachtree eventually revoked Gaf–Fad's merchant account due to the credit activity at the store. Citibank also reported that still other fraudulent cards were used to the tune of $17,500 at the store, and $43,000 elsewhere. Agent Kenny also testified that when appellants were arrested for the instant offense, he found a crumpled Visa receipt bearing the name Adam Corzine and an identification card with Corzine's name but Gafari's picture. Also found throughout the boutique and in Fadayini's car were some 75 blank credit card applications. Further testimony indicated that appellants used a stolen card to buy tires while awaiting trial in this case, an offense that led to bond revocation. No charges were filed in any of these cases.

After accepting sentencing memoranda from both parties, Judge Gesell set Fadayini's offense level at 20 and Gafari's at 22, each of which included enhancements for "more than minimal planning" of the crime, and obstruction of justice. Pursuant to § 5K2.0 of the Guidelines (which allows the sentencing judge to impose a sentence outside the Guidelines' range based on factors not adequately taken into account by the Sentencing Commission in drafting the Guidelines) the court then added to each

offense level 3 levels for appellants' continuing engagement in fraudulent conduct while on release (analogizing to U.S.S.G. § 2J1.7); 2 levels for the "extraordinary extent of the criminal conduct" (analogizing to U.S.S.G. § 4A1.3(e)); and 1 level to account for the non-monetary harm done to the victim of appellants' scheme. The adjustments resulted in sentences of 41 months for Gafari and 33 months for Fadayini. Upon the government's motion for clarification, those sentences were reduced because the court erroneously considered the uncharged conduct in calculating the total dollar amount of the offense. The recalculated sentences were 37 and 30 months, respectively, in addition to the mandatory minimum three years' supervised release. Both appellants have served their sentences and currently are on supervised release.

Appellants make four broad arguments on appeal: (1) each claims the evidence submitted at trial was insufficient to support one or more of his respective convictions; (2) each argues that the court erred in qualifying Agent Byers as an expert witness; (3) each contends that the ATM photographs admitted into evidence were not properly authenticated; and (4) each challenges the court's base offense level enhancement and its upward departure from the guideline range.

## II. Discussion

### A. *Sufficiency of the Evidence*

1. *Fadayini.* Fadayini does not challenge the sufficiency of the evidence used to convict him on the counts where photographic evidence linked him to the offense (Riggs and First American). What he does challenge is the Crestar conviction, which (along with the Signet count on which he was acquitted) was not supported with photographic evidence. But surely the jury could infer from Fadayini's use of the card at Riggs and First American that he used the card at Crestar as well: The card was used at Crestar nineteen times over a three day period at locations and times in close proximity to withdrawals to which appellant was photographically linked. As we draw no distinction between direct and circumstantial evidence in evaluating the government's

proof, *United States v. Harris*, 435 F.2d 74, 88 (D.C.Cir.1970), the evidence presented was sufficient to convict Fadayini on the Crestar count.

■ 2. *Gafari.* In denying Gafari's motion for a new trial, the court concluded that the government's proof demonstrated beyond a reasonable doubt that Gafari aided and abetted Fadayini in the commission of credit card fraud. The court based its conclusion on the ATM photographs, "some [of which] with clarity show [Gafari] using the card, some show him in company with the co-defendant on a particular occasion when the card was used numerous times at the same location." Order Denying Defendants' Motion for a New Trial and/or Judgment of Acquittal N.O.V. (July 24, 1991). Gafari challenges the court's finding, arguing that the photographic evidence is not sufficient to establish that he had the specific intent required to commit either the bank fraud or access device fraud offenses.

If the trial court's finding that "some of the ATM photographs with clarity show [Gafari] using the card" was intended to mean that Gafari was shown exercising direct physical control of the card, then we think the court misspoke. Nowhere did Agent Byers, who identified Gafari in the photos, testify that Gafari was shown handling the card. Rather, the evidence against Gafari was all indirect—photographs depicting him either standing near an ATM at the time the card was being used or seated in the driver's seat of a car parked at or near an ATM.

Nevertheless, the court's apparent mischaracterization of the evidence does not alter its ultimate conclusion that Gafari had the requisite intent to commit bank fraud. Under either a "direct use" theory or an aiding and abetting theory, the circumstantial photographic evidence was sufficient to link Gafari to the commission of the crime. With respect to direct use, at least one of the ATM photographs shows Gafari in the driver's seat of a vehicle parked at a drive-through ATM in Temple Hills, Maryland. Because such ATMs are usually located on the driver's side, one can draw a permissible inference that Gafari used the Martha Hunt card to withdraw money from that particular ATM.

An aiding and abetting theory is applicable as well. "In order to convict a defendant of aiding and abetting a crime, a jury must find beyond a reasonable doubt that the defendant willingly associated himself with a criminal venture and participated therein as something he wished to bring about. The abettor's criminal intent may be inferred from circumstantial evidence, and the government must prove only that the abettor intended to assist the perpetrator of the crime." *United States v. Castro*, 887 F.2d 988, 995–96 (9th Cir.1989) (internal quotations and citations omitted). Here, although no evidence linked Gafari with the application for the Martha Hunt card and none of the pictures show him with card in hand, it is not unreasonable to infer that he was aware of the crime and acquiesced in it. He was pictured with Fadayini as the card was being used multiple times, suggesting that he knew of and did nothing to prevent the crime. In addition, he was seen waiting for Fadayini in the car, creating a not so unreasonable inference that he aided in the crime by transporting Fadayini from one ATM to the next. And, for the reasons discussed in reference to Fadayini's sufficiency challenge, the proximity in time and place of the photographed offenses to the non-photographed ones is sufficient to create an inference that Gafari aided and abetted in those crimes as well.

Accordingly, both sets of convictions withstand appellants' sufficiency challenges.

## B. *The ATM Photos*

■ 1. *Qualification of Agent Byers.* Appellants contend that the court abused its discretion by qualifying Agent Byers as an expert witness in the identification of individuals from photographs. Although we are troubled by the court's ruling, we do not think it rose to a level of abuse of discretion. Agent Byers testified that as part of his duties for six years as a Secret Service Agent, he was assigned to protective details guarding the President, Vice President, and visiting dignitaries on over 200 occasions. Prior to each assignment, he would review photographs of persons known to pose secu-

rity risks and then watch for those individuals at any location visited by the protectee, focusing particularly on facial features and distinguishing marks. Purporting to rely on this experience, Agent Byers positively identified appellants as the individuals depicted in a number of the ATM photographs.

The troubling aspect of the court's qualification of Agent Byers is not so much the training and experience upon which the agent based his supposed expertise. Courts are well within their discretion to qualify expert witnesses whose expertise was obtained "in something more than a casual manner." *United States v. Carswell,* 922 F.2d 876, 878 (D.C.Cir.1991). Certainly that is the case here. What does concern us, however, is that the opinions Agent Byers expressed do not really *require* any particular expertise. Where the jury is just as capable of drawing correct conclusions as the witness possessed with special training, expert testimony is unnecessary. In *United States v. Brewer,* 783 F.2d 841 (9th Cir.1986), for instance, the Ninth Circuit held that it was not an abuse of discretion for the trial court to disallow the expert testimony of a forensic anthropologist as to whether the defendant was pictured in bank surveillance photographs. In the court's view, the untrained juror could fully assess the photographs without the assistance of the expert. The same is true here. But whether the court's ruling constitutes an abuse of discretion is another question. We conclude that it does not. Although Agent Byers' testimony may have been unnecessary, we cannot say that it was totally unhelpful to the jury. It may have served to focus the jury on particular characteristics of the defendants (*e.g.,* facial features, distinguishing marks), thereby aiding the jurors' independent assessments of the photographs. Accordingly, we uphold the trial court's qualification of Agent Byers as an expert witness.

[4] 2. *Authentication.* We conclude also that the ATM photos were properly authenticated. Clearly, testimony by bank personnel familiar with the operation of the ATM cameras, and the time and date imprints on the photographs themselves, were sufficient "to permit a reasonable juror to find that the evidence is what its proponent claims." *United States v. Rembert,* 863 F.2d 1023, 1027 (D.C.Cir.1988).

## C. The Sentences

] In reviewing appellants' sentences, we must address initially the government's claim that because appellants have served their sentences, consideration of the trial court's sentence calculation is moot. A criminal appeal is moot only if there is "no *possibility* that any collateral legal consequences will be imposed" upon the defendant. *Sibron v. New York,* 392 U.S. 40, 57, 88 S.Ct. 1889, 1899, 20 L.Ed.2d 917 (1968) (emphasis added). There are two such potential consequences in this case: (1) if appellants' sentences were reduced to less than 13 months, each would receive two instead of three criminal history points—a reduction that could affect the duration of any future sentence they might receive in federal court, *see, e.g., United States v. Dickey,* 924 F.2d 836, 838 (9th Cir.), *cert. denied,* — U.S. ——, 112 S.Ct. 383, 116 L.Ed.2d 334 (1991); and (2) if appellants' sentences were reduced, each might be eligible for a credit against their period of supervised release for the excess time they spent in prison. Although the government may be correct that both of these contingencies are remote, *Sibron* requires only that they be possible. Consequently, the sentencing issue is not moot.

Moving to the merits of the sentences, appellants argue on several grounds that the trial court erred in imposing upward departures from the sentencing range suggested by the Guidelines for the instant offense. In reviewing departures from the Guidelines, this Court (1) ascertains "whether the district court's reasons for the departure are, as a matter of law, of a kind or degree that may appropriately be relied upon to justify a departure," (2) determines "whether the facts supporting the district court's reasoning are clearly erroneous," and (3) reviews "the extent of the departure under a standard of reasonableness." *United States v. Jones,* 948 F.2d 732, 736 (D.C.Cir. 1991) (internal citations and quotations omitted). Applying this standard, we conclude that the departures imposed by the trial

court were based on a proper application of the Guidelines to the facts and were otherwise reasonable.

■ First, the trial court properly imposed under § 5K2.0 of the Guidelines a three-level departure for appellants' continuing criminal activity occurring "during the time [appellants] were on release from the instant offense as well as the earlier Bloomingdale's arrest." Sentencing Memorandum at 4. Evidence of such conduct included the phony card charges that occurred through appellant's clothing store, the bogus cards found in appellants' possession upon their arrest, and the numerous credit card applications found in the clothing store and in Fadayini's car. The Guidelines make clear that post-arrest criminal conduct can warrant additional penalty. *See* U.S.S.G. § 2J1.7 (authorizing a three-level departure when the instant offense occurs while on release). Because this case involves criminal conduct occurring after the instant offense, it does not fit squarely within the rubric of § 2J1.7. However, we agree with the trial court that appellants' post-arrest criminal conduct was of a nature not adequately taken into account by the Sentencing Commission. It is therefore an appropriate basis for departure under § 5K2.0. Finally, a three-level departure is reasonable, given that it is the same level of departure recommended by § 2J1.7.

■ The court also properly departed two levels under § 5K2.0 based on the extent of appellants' immersion in fraudulent activity. The evidence showed that appellants' involvement in credit card fraud was longstanding and extensive. But because appellants were not convicted of any prior offenses, such conduct was not taken into account in determining their criminal history categories under § 4A1.3. We conclude that by analogy to § 4A1.3, non-conviction misconduct may be a proper basis for departure under § 5K2.0 if it reveals extensive immersion in criminality similar in type to the charged offense. *Cf. United States v. Dawson*, 1 F.3d 457, 464–65 (7th Cir.1993) (suggesting that upward departure may be appropriate under § 5K2.0 where uncharged conduct is not a basis for a criminal history category enhancement and is similar to the conviction

offense). On this record, it was not error for the trial court to conclude that appellants' conduct merited a two-level departure.

■ Appellants also argue that the court erred by imposing a one-level upward departure based on the intangible effect that appellants' fraud had on their victim. The court concluded that "the intrusion into [a victim's] privacy and peace of mind" and the aggravation that a victim may suffer "in attempting to set the record straight" were factors not considered by the Sentencing Commission in determining the applicable range for the instant offense. Because some degree of injury to credit and emotional discomfort is inevitable in *any* credit fraud scheme, we cannot say that an upward departure on those grounds is appropriate in the ordinary case. However, the Sentencing Guidelines explicitly permit an upward departure in fraud cases "where the [monetary] loss ... does not fully capture the harmfulness and seriousness of the conduct." U.S.S.G. § 2F1.1(b)(1), application note 10. Frauds contemplated by the Commission as warranting such a departure include those that "risk[ ] reasonably foreseeable, substantial non-monetary harm," "cause[ ] reasonably foreseeable, physical or psychological harm," and "knowing[ly] endanger[ ] the solvency of one or more victims." *Id.*, application notes 10(a), (c), (f). Although the trial court based its departure on § 5K2.0, all the above examples from § 2F1.1 reasonably could describe the fraud involved here. We therefore uphold the trial court's enhancement insofar as it was based on appellants' extraordinary conduct in this case. Considering the volume of fraud perpetrated on Ms. Hunt, and testimony by Ms. Hunt of the distress she experienced over having to rectify her credit difficulties, it was not error for the trial court to impose a one-level upward departure.

### III. CONCLUSION

For the foregoing reasons, appellants' convictions and sentences are

*Affirmed.*