UNITED STATES of America

v.

Jacob Wesley RHODES, Defendant.

Crim. No. 94–445 (CRR).

United States District Court,
District of Columbia.

July 10, 1995.

Thomas E. Zeno, Asst. U.S. Atty., Washington, DC, for the Government.

Shawn Moore, Washington, DC, for defendant.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

### INTRODUCTION

On April 20, 1995, April 25, 1995, and July 5, 1995, the Court held an evidentiary hearing on the Defendant's objections to the Presentence Investigation Report dated March 20, 1995. Prior to sentencing on July 7, 1995, which lasted more than 1½ hours, the Court first listened to defense counsel and then heard the Defendant read an eight-page statement which the Court directed be made a part of the record herein. After listening to the written statement of the Defendant, the Court noticed that the Defendant claimed, *inter alia,* that the previous prosecutor in the case may have made a promise as to the Defendant's possible sentence in this case, and that his previous counsel may have been ineffective in the plea negotiations and should have done more research. As a result thereof, the Court, *sua sponte,* made inquiry again regarding the voluntariness of the Defendant's plea of guilty and, among other things, advised the Defendant that the Court does not accept pleas from innocent people, and that if he still desired a trial he could have one. After further colloquy between the Court and the Defendant, the Defendant was advised that if the Court proceeded to sentencing, the Defendant would waive any and all of the following claims: (1) that the prosecutor may have, or did in fact, enter into an agreement with the Defendant regarding the amount of time he would receive by virtue of his cooperation in this case; (2) any claim of ineffective assistance of counsel; and (3) that if he did not like the sentence imposed on that date he would thereafter have no right to withdraw his plea.

Following this inquiry, the Court took the precaution of taking a recess to give the Defendant and his counsel an opportunity to confer and reflect upon these questions by the Court. After the recess, the Defendant was again advised that he could still withdraw his plea if he wished, and he positively and unequivocally said he did waive the aforementioned claims and wanted to proceed to sentencing, and did so without coercion or duress on the part of anybody.

By virtue of the Defendant's responses, on July 7, 1995, the Court sentenced the Defendant to 87 months in prison, followed by a five-year period of supervised release, as a result of his plea of guilty on December 22, 1994 to Count One of the Indictment filed in this case. This Memorandum Opinion shall set forth the Court's findings of fact and conclusions of law with respect to the sentence imposed, the term of supervised release, the special assessment, and the restitution.

### BACKGROUND

On November 16, 1994, a federal grand jury returned a four-count Indictment charging the Defendant, Jacob Wesley Rhodes, with Bank Fraud and Aiding and Abetting, in violation of 18 U.S.C. §§ 1344 & 2. On December 22, 1994, the Defendant pled guilty to Count One of the Indictment, pursuant to a written plea agreement. As part of the agreement, the Defendant agreed that the applicable base offense level for the offense is 6, pursuant to U.S.S.G. § 2F1.1, and agreed not to oppose the following adjustments: 5 levels for "loss in excess of $40,000," pursuant to U.S.S.G. § 2F1.1(b)(1)(F); and 2 levels for "more than minimum planning," pursuant to U.S.S.G. § 2F1.1(b)(2). PSR at ¶ 2.

Following a hearing held in this case on February 10, 1995, the Defendant was arrested in Maryland for passing another bad check. Thereafter, on February 13, 1995, this Court revoked the Defendant's conditions of work release, and ordered that he be held without bond pending sentencing. The Defendant submits that the acts which led to his arrest on February 10, 1995 were performed in an effort to provide assistance to the Government in its investigation of other individuals engaged in bank fraud.

Two related matters are also before this Court in separate proceedings. In particular, on January 6, 1995, David Ross pled guilty to a one-count Information, which charged him with Bank Fraud and Aiding and Abetting, in violation of 18 U.S.C. §§ 1344 & 2. Michael Myers also pled guilty to a one-count Information charging him with Bank Fraud and Aiding and Abetting, in violation of 18 U.S.C. §§ 1344 & 2. The Defendant admits that he supervised these individuals in connection with the bank fraud scheme. Tr. (July 5, 1995) at 16.

With the exceptions set forth in this Memorandum Opinion, the Court adopts the findings contained in the Presentence Investigation Report ("PSR") dated April 7, 1995.

### DISCUSSION

The Defendant has lodged several objections to the PSR, each of which the Court shall address below.

### I. TO THE EXTENT THAT THE PROBATION OFFICE HAS VERIFIED THE DEFENDANT'S PRIOR CONVICTIONS AND PENDING CHARGES, THE COURT HAS PROPERLY CONSIDERED THE SAME IN FASHIONING A SENTENCE

■ First, the Defendant objects to several paragraphs under his criminal history, alleging that he never committed many of the crimes listed. As to those convictions for which the Probation Office has no documentation, the Court has not considered them in determining his sentence. Even if the Court disregards the convictions which the Probation Office was unable to verify, however, the Defendant is still well over the required points for criminal history category VI. Accordingly, no adjustment to the applicable criminal history category is warranted.

■ The Defendant similarly objects to the pending charges set forth in paragraphs 94, 96 and 97 of the PSR. Again, however, the Probation Office has documentation for these arrests. As to the pending charge set forth in paragraph 94 (regarding his arrest on February 10, 1995 following a Court appearance in this case), the Defendant claims he lacked criminal intent, because he purportedly committed the acts underlying the arrest in an attempt to assist the Government. This argument is irrelevant, however, as the Defendant's February 10, 1995 arrest and pending charge have been verified. Accordingly, the Court finds no merit to the Defendant's objections to paragraphs 94, 96 and 97.

### II. WITHOUT OBJECTION, THE COURT SHALL PLACE THE TOTAL LOSS AT $70,000 OR LESS FOR PURPOSES OF DETERMINING THE APPROPRIATE OFFENSE LEVEL

The Defendant next objects to the amount of total loss used in fashioning his offense level. See PSR ¶ 7. The FBI retrieved the amount relied upon in the PSR ($206,450.50) from the typewriter ribbon used to write the checks. The typewriter was found in a locked room to which the Defendant had the only key. Id. At a hearing on April 25, 1995, however, counsel for the Government represented that, reading the transcript of the plea proceeding in a light most favorable to the Defendant, "the government is willing to live with the calculation that the loss is $70,000 or less." Tr. (April 25, 1995) at 15. Accordingly, pursuant to U.S.S.G. § 2F1.1(b)(1)(F), the Court shall add 5 levels to the base offense level of 6. In contrast, the PSR adds 8 levels pursuant to § 2F1.1(b)(1)(I), having placed the total loss at $206,450.50. See PSR at ¶ 47.

### III. THE COURT FINDS THAT A FOUR–LEVEL ADJUSTMENT FOR BEING AN ORGANIZER OR LEADER OF THE CRIMINAL ACTIVITY IS WARRANTED IN THIS CASE

The Defendant also objects to a four-level adjustment for being an organizer or leader of the criminal activity under U.S.S.G. § 3B1.1(a), which provides that "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels." See PSR at ¶ 50. The

Defendant claims that there is insufficient evidence to show that he supervised five or more people. The Court disagrees. Moreover, in any event, section 3B1.1(a) provides that a four-level increase is proper if the criminal activity "was otherwise extensive." U.S.S.G. § 3B1.1(a). There is no question that the bank fraud scheme at issue was extensive.

■ First, the Court finds that a preponderance of the evidence shows that the Defendant was an organizer or leader of a criminal activity involving five or more participants. In particular, the Defendant himself testified that he "had some supervisory role with Mr. David Ross and Michael Myers." Tr. (July 5, 1995) at 16; *see also* PSR at ¶ 39. At the July 5, 1995 hearing, FBI Special Agent Christopher H. Kirwan testified that Mr. Ross and Mr. Myers both told him that the Defendant supervised this check fraud operation. Tr. (July 5, 1995) at 37–38.

Special Agent Christopher H. Kirwan further testified that a "protected identity male," who negotiated some of the checks involved in the scheme at the Defendant's direction, advised Special Agent Kirwan that he "believed that Mr. Rhodes was the one running it, because Mr. Rhodes was the one that had the checks, Mr. Rhodes was the one who was signing the checks, and Mr. Rhodes was directing what was to be done, when and where." Tr. (July 5, 1995) at 53–54.

Special Agent Kirwan also stated that the protected male identified one Willie Stewart as working for the Defendant in connection with the fraudulent check scheme. According to Special Agent Kirwan, Mr. Stewart had "[t]he same [role] as this protected male essentially, that is negotiating checks at the direction of Mr. Rhodes...." Tr. (July 5, 1995), at 54–55.

The Court found Special Agent Kirwan highly credible. In response to the Court's question as to what information, if any, he had that the protected male was reliable, Special Agent Kirwan responded that "[h]is statement was given freely. It was given against self-interest. It was in the nature of a confession, and it was corroborated by the bank records that I found as to checks that

were negotiated by that protected male." *Id.* at 54. The Court therefore credits Special Agent Kirwan's testimony regarding the information provided by the protected identity male, and finds that a preponderance of the evidence reveals that at least five people were involved in the bank fraud scheme led or organized by the Defendant: the Defendant himself, Mr. Myers, Mr. Ross, the protected identity male (whom Special Agent Kirwan testified was "separate from" Mr. Myers and Mr. Ross) and Willie Stewart. *Id.* Although the Defendant denies that he supervised anyone other than Mr. Myers and Mr. Ross, the Court observes that it has heard from the Defendant on several occasions from the time of his plea until this date, and does not find him to be a credible witness.

■ Even if the Defendant could successfully controvert the Government's assertion that there were five or more people involved in the illegal enterprise of which he was a part, section 3B1.1(a) applies if the criminal activity was "otherwise extensive." Here, it cannot be seriously disputed that the bank fraud scheme was extensive, consistent, involved thousands of dollars and covered a multitude of transactions, as evidenced by Government's Exhibit 2, which was admitted into evidence at the July 5, 1995 hearing. Moreover, the scheme was pervasive in that, even without regard to the Government's contention that the Defendant was involved in bank fraud in North Carolina, such illegal activity occurred at various banks in the District of Columbia, Virginia and Maryland.

In addition, Application Note 3 to section 3B1.1(a) provides that "[i]n assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." U.S.S.G. § 3B1.1(a), Application Note 3.

Here, many outsiders participated in the bank fraud scheme. For example, the PSR provides that the Defendant's sister, Bernita Rhodes, engaged in bank fraud with the Defendant under the alias "Louise Morton."

PSR at ¶¶ 20, 28. The PSR further states that the Defendant received checks from his brother, John Rhodes (who purchased them from a man named Kenny), and from his nephew, Charles Cooper. PSR at ¶¶ 33, 34. The Defendant himself also testified that he obtained a series of checks from a woman named "Monica," and that he knowingly obtained stolen checks from a Simon Steele. Tr. (July 5, 1995) at 20, 23–25. *See also* PSR at ¶¶ 31, 36. The Defendant explained, "there have been occasions where I have done something illegal" in connection with Mr. Steele. *Id.* at 26. In addition, Special Agent Kirwan testified that the name of one Lisa Peedin appeared on the typewriter ribbon obtained from the Defendant's residence, and the Government submitted an exhibit with copies of checks negotiated in favor of Lisa Peedin. *Id.* at 41. *See* Govt's Exh. 12. Special Agent Kirwan further testified that the name "Carolyn Bass" was used to defraud banks with the checks at issue, and that the Defendant told them that he obtained some of the checks from a man named "Tank," whom they were able tentatively to identify. Tr. (July 5, 1995), at 58, 60.

Finally, the Court observes that there were likely many unwitting participants in this scheme which further support the applicability of section 3B1.1. Indeed, the Defendant testified that "[o]n occasion I would buy someone else's driver's license, or something. If someone would lose a driver's license or something, someone might bring it to me and I would buy it." *Id.* at 18. *See also id.* at 16 ("People would come to me and ask me to buy checks, or identification, or something like that, and on occasion I would."). In light of this evidence and the entire record herein, the Court finds that a four-level upward departure is wholly justified for the Defendant's role as an organizer or leader in "extensive" criminal activity. U.S.S.G. § 3B1.1(a).

The Court also notes that the Commentary to section 3B1.1 provides that "[a]n upward departure may be warranted . . . in the case of a defendant who did *not* organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization." U.S.S.G. § 3B1.1(a), Application Note 2 (emphasis added). As the detailed review of the evidence above suggests, the record herein clearly demonstrates that the Defendant exercised management responsibility over the activities of the bank fraud scheme. Accordingly, a four-level upward departure is warranted on that basis as well.

## IV. THE COURT FINDS NO MERIT TO THE DEFENDANT'S CLAIM THAT HE SHOULD RECEIVE A TWO–LEVEL ADJUSTMENT FOR ACCEPTANCE OF RESPONSIBILITY

The Defendant next objects to not receiving a two-level adjustment for acceptance of responsibility. *See* PSR at ¶ 53. The Court, however, agrees with the Probation Office that a reduction is unwarranted because, following a Court appearance in this case, the Defendant was arrested on February 10, 1995 for the same conduct for which he was convicted. It is appropriate for the Court to consider the "voluntary termination or withdrawal from criminal conduct or associations" in ascertaining whether the decrease is warranted. U.S.S.G. § 3E1.1, Application Note 1(b); *see also id.,* Application Note 3 ("[E]vidence [of acceptance of responsibility] may be outweighed by conduct of the defendant that is inconsistent with acceptance of such responsibility. A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right."). Here, the Defendant's commission of bank fraud pending sentencing on his conviction in this case renders him ineligible for the two-level reduction.

The Court also notes that the Commentary to section 3E1.1 provides that "a defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility." *Id.,* Application Note 1(a). Here, as set forth above, the Defendant falsely and frivolously contests numerous convictions and pending charges which the Probation Office has verified with appropriate documentation. Accordingly,

the Defendant does not qualify for a two-level decrease.

### V. THE COURT FINDS THAT A THREE–LEVEL UPWARD ADJUSTMENT IS PROPER BECAUSE THE DEFENDANT ENGAGED IN FURTHER CRIMINAL ACTIVITY FOLLOWING A COURT APPEARANCE IN THIS CASE

■ The Government has filed a "Memorandum in Support of an Upward Departure," arguing that a three-level increase is warranted in light of the Defendant's arrest on February 10, 1995 following a Court appearance in the instant case. The Court agrees. The Government relies upon *United States v. Fadayini*, 28 F.3d 1236 (D.C.Cir. 1994), in which the trial court added three levels to each defendant's offense level because they had engaged in fraudulent conduct while on release. The Court of Appeals held:

> [W]e agree with the trial court that appellants' post-arrest criminal conduct was of a nature not adequately taken into account by the Sentencing Commission. It is therefore an appropriate basis for departure under § 5K2.0. Finally, a three-level departure is reasonable, given that it is the same level of departure recommended by § 2J1.7.[1]

*Id.* at 1242.

The Court finds that *Fadayini* applies here because the Defendant continued to commit check fraud while on release. Indeed, the Defendant's conduct was particularly egregious in that he was arrested within hours of leaving the courtroom where his conditions of release had been discussed and modified by the Court. During the hearing on February 10, 1995, the Court restricted the Defendant's release conditions because he was claiming to work for a company which was run by his family members and located at the same address where fraudulent checks were prepared during the fraud for which the Defendant was convicted. The Defendant was thus alerted to the Court's concern about his conduct while on release pending sentencing and should have been particularly careful to follow the conditions of release set by this Court. Instead, the Defendant, visibly angry at the Court for its ruling, went to a bank and attempted to pass another bad check. Under *Fadayini*, such conduct warrants a three-level increase in the offense level applicable in this case.[2]

### VI. THE COURT SHALL ORDER THE DEFENDANT TO PAY RESTITUTION IN THE AMOUNT OF $10,-000

■ In accordance with 18 U.S.C. §§ 3663 and 3664, the Court may order restitution. The total loss attributed to the Defendant is $88,394.05. PSR at ¶ 127. The Government requests an order of restitution in the full amount, arguing that the Defendant will earn some money while incarcerated and that such an order can be of considerable assistance to the victims as it may be enforced in later years "in the same manner as a judgment in a civil action." 18 U.S.C. § 3663(h).

However, the Court finds that, due to the Defendant's physical condition (sight loss) and his need for employment assistance after he is released from incarceration, a restitution order in the full amount is impracticable. Rather, the Court shall order restitution in the amount of $10,000.

### CONCLUSION

The Court thus finds that, with a base offense level of 6, an increase of 5 levels for a

---

1. The Court of Appeals did not apply U.S.S.G. § 2J1.7 (Commission of Offense While on Release), but merely analogized to that provision because, as in this case, *Fadayini* involved conduct occurring after the offense of conviction at issue, while section 2J1.7 applies when the instant offense was committed while on release on another federal charge.

2. The Court observes that U.S.S.G. § 4A1.3 provides further grounds for an upward departure, because the criminal history category VI does not reflect the Defendant's record of criminal conduct. Even if the Court does not consider those convictions for which the Probation Office lacks documentation, the Defendant has 32 criminal history points, while a category VI only requires 13 points. This criminal history category "significantly underrepresents the seriousness of the defendant's criminal history *or the likelihood that the defendant will commit further crimes.*" U.S.S.G. § 4A1.3 (emphasis added).

loss not more than $70,000, an increase of 2 levels for more than minimal planning, an increase of 4 levels for being an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, and an increase of 3 levels for engaging in further criminal activity while on release, the proper adjusted offense level is 20. *See* Tr. (April 25, 1995) at 16. The Court further finds that the Defendant is in criminal history category VI. Accordingly, the sentencing range is 70 to 87 months. Given the long history of the Defendant's criminal conduct, the Court determines that the Defendant shall be sentenced to 87 months in prison.

Accordingly, pursuant to the Sentencing Reform Act of 1984 and the application of the United States Sentencing Commission Guidelines, it is the judgment of the Court that the Defendant, Jacob Wesley Rhodes shall be, and hereby is, committed to the custody of the U.S. Bureau of Prisons for a term of 87 months on Count One, followed by a five-year period of supervised release, together with a special assessment of $50 to be paid within 6 months of this date. Within 72 hours of release from confinement, the Defendant shall report in person to the Probation Office in the district to which he is released.

While on supervised release, the Defendant shall not commit another federal, state, or local crime, and shall abide by the standard conditions of supervised release as recommended by the United States Sentencing Commission and such further orders as the Probation Officer to whom this case is assigned or the Court may from time to time issue. The Defendant shall comply with the following special conditions:

(1) The Defendant shall not possess a firearm or any other dangerous weapon or device for any reason.

(2) The Defendant shall not use, possess, transport, sell, or distribute any illegal drugs or associate with any individual who engages in that conduct; nor shall he frequent any place where illegal drugs are possessed, used, sold, or distributed.

(3) The Defendant shall not engage in any illegal conduct involving checks, money orders, or the like.

(4) The Defendant shall work full-time, if not enrolled in an educational program, or part-time. If he is participating in an educational program, he shall at least work on a part-time basis.

(5) The Defendant shall make restitution in the amount of $10,000, commencing within 6 months of this date, payable on a pro rata basis in proportion to the loss sustained, as determined and directed by the Probation Office in consultation with the Office of the United States Attorney, to the following payees:

a) Riggs National Bank, 1120 Vermont Avenue, N.W., Washington, D.C. 20005

b) Nations Bank, 2601 University Boulevard, Wheaton, MD 20902

c) Chevy Chase Bank, 8401 Connecticut Avenue, Chevy Chase, MD 20815

d) Crestar Bank, 5380–C Eisenhower, P.O. Box 179, Alexandria, VA 22314–0179

e) First Union Bank, 801 Pennsylvania Avenue, N.W., Washington, D.C.

f) Signet Bank, 7 No. 8th Street, Richmond, VA 23229

g) Citizens Bank of Virginia, 1401 Sweitzer Lane, Laurel, MD 20707

Lastly, since the Court finds that the Defendant does not have the ability to pay a fine, or the costs of incarceration or supervision, these sanctions will not be imposed. This is the judgment and sentence of the Court.