**UNITED STATES of America,
Plaintiff,**

v.

**Bruce W. RHODES, Defendant.**

**No. 01–30012.**

United States District Court,
C.D. Illinois,
Springfield Division.

May 1, 2002.

---

Joseph H. Hartzler, Office of U.S. Attorney, Springfield, IL, for Plaintiff.

Scott Helmholz, Sorling, Northrup, Hanna, Cullen & Cochran, Ltd., Springfield, IL, for Defendant.

## *OPINION*

RICHARD MILLS, District Judge.

"No man profiteth but by the loss of others."

Montaigne: *Essays,* I.xxi.

Evidently taking Montaigne's words to heart, Bruce W. Rhodes swindled over 240 investors out of $1,104,557.39.

However, he will spend the next 37 months of his life in the custody of the Bureau of Prisons because of *his* actions.

## I.  BACKGROUND

According to his written plea agreement, Bruce W. Rhodes worked as an investment representative for the investment brokerage firm Magna Investments, Inc., be-

tween October 1997 and July 1999. During that time, Rhodes devised a scheme whereby, in certain instances, he knowingly misdirected funds that customers had entrusted to him and to Magna Investments in order to obtain more money for himself. Rhodes did so in two ways.

*First,* Rhodes misused customers' money by directing funds which were in, or intended to be placed in, the customers' accounts to be deposited into one of his accounts so that he could use that money for personal expenses (hereinafter "the direct embezzlement victims").[1] *Second,* Rhodes misused customers' funds by directing, in certain instances, that the customers' money be used to purchase investments which the customers did not request (such as long-term callable certificates of deposit and annuities) but which paid him and Magna Investments a higher commission than would have been paid on the investments which the customers had requested (hereinafter "the unrequested investment victims").[2] To cause the misdirection of customers' funds, Rhodes, on several occasions, made false statements, prepared false documents, and made use of the United States mails in order to facilitate his fraudulent scheme.

On January 4, 2001, a federal grand jury returned a six count Indictment against Rhodes as a result of this conduct. Counts I through IV charged him with mail fraud in violation of 18 U.S.C. § 1341; Counts V and VI charged him with wire fraud in violation of 18 U.S.C. § 1343. On July 2, 2001, Rhodes changed his plea before United States Magistrate Judge Byron G. Cudmore from not guilty to guilty to one Count of mail fraud in violation of 18 U.S.C. § 1341.[3] On July 18,

2001, the Court accepted Magistrate Judge Cudmore's Report and Recommendation regarding Rhodes' adjudication of guilt. At his sentencing hearing, Rhodes raised the following unresolved objections to his Presentence Investigation Report ("PSR").

## II. OBJECTIONS AND FINDINGS

### A. *Paragraph 21*

Rhodes objects to paragraph 21 because he denies that he wrongfully diverted any funds from his grandmother, Grace Shrive. In support of his argument, Rhodes points to a letter written by his grandmother to the Court wherein Mrs. Shrive denies that Rhodes ever diverted any funds from her account into his.

However, even assuming that Rhodes did divert money from his grandmother without her permission, neither paragraph 21 nor any other paragraph within the PSR employs that money in calculating the amount of loss for Sentencing Guidelines purposes or for purposes of calculating restitution. Accordingly, because Rhodes' objection to paragraph 21 does not affect his sentencing, the Court declines to make a factual finding on that objection pursuant to Federal Rule of Criminal Procedure 32(c)(1).

### B. *Paragraphs 105, 106, 111, & 112*

Rhodes objects to paragraphs 105, 106, 111, and 112 wherein he receives an eleven level increase, pursuant to U.S.S.G. § 2F1.1(b)(1)(L), to his base offense level because the amount of loss attributable to him is more than $800,000.00 but less than $1,500,000.00. Rhodes argues that the Court should find the appropriate guideline section to be U.S.S.G. § 2F1.1(b)(1)(E)

---

**1.** Rhodes directly embezzled money from approximately six customers by this means.

**2.** Rhodes defrauded money from approximately 240 customers by this means.

**3.** Pursuant to the plea agreement, the Government moved to dismiss the remaining Counts against Rhodes at his sentencing hearing, and the Court allowed this motion.

because the correct amount of loss which his fraud caused is more than $20,000.00 but less than $40,000.00, thereby adding only four additional points to his base offense level. Rhodes makes three arguments in support of this position.

*First,* Rhodes asserts that his offense of conviction and his alleged relevant conduct are so separate and distinct that they cannot constitute part of the same course of conduct, common scheme, or plan. Specifically, Rhodes contends that he only pleaded guilty to fraudulently converting funds from Roy Bertelli and June Myers (two of the direct embezzlement victims) which are crimes akin to theft by deception or embezzlement. Rhodes claims that this conduct is vastly different than his conduct regarding the 240 unrequested investment victims. Rhodes claims that the Government has presented no evidence that the embezzlement victims and the unrequested investment victims are in any way connected by a common factor such as a common victim, common accomplices, a common purpose, or a similar *modus operandi.*

*Second,* Rhodes argues that his conduct did not cause any loss to the 240 unrequested investment victims; rather, he suggests that the only reason that these investors lost any money at all was due to the rising interest rates which resulted in a decline in the market value of long-term certificates of deposit-a decline which was not reasonably foreseeable. In fact, Rhodes claims that, had interest rates fallen, the victims would have made more money on the investments which he made for them versus the investments which they had requested. In any event, Rhodes contends that his sentence should not depend upon the fortuity of the interest rate fluctuations because it would make one of the Sentencing Guidelines' purposes (*i.e.,* uniformity) virtually unattainable.

*Third,* Rhodes argues that Magna Investments is not a "victim" for purposes of the Sentencing Guidelines. Because Magna Investments was under no legal obligation to do so but, rather, voluntarily elected to reimburse the investors for the losses which they realized on the re-sale of the long-term callable certificates of deposit in which he had invested their money and for the surrender charges incurred in connection with the rescission of the unrequested annuity contracts, Rhodes asserts that Magna Investments has only suffered "consequential damages" which are excluded from the amount of loss calculation. U.S.S.G. § 2F1.1, comment., (n. 8(c)); *United States v. Marlatt,* 24 F.3d 1005, 1007 (7th Cir.1994). Rhodes claims that Magna Investments reimbursed these investors in order to protect its own business interests in fending off law suits, adverse publicity, and the wrath of regulators.

Moreover, because Magna Investments decided when to sell the victims' unrequested, long-term certificates of deposit and annuities, Rhodes argues that Magna Investments was the architect of its own losses. Had Magna waited until the interest rate market reversed itself, Rhodes claims that the amount of loss would not have been as great. As such, Rhodes contends that this reimbursement money paid by Magna Investments to its customers who received investments which they had not requested should not be considered in calculating the amount of loss for sentencing purposes.

Furthermore, Rhodes argues that Magna Investments' own conduct in failing to regulate him and by providing false and misleading monthly statements to investors caused the loss which it has suffered. In short, Rhodes asserts that his conduct did not cause investors to lose money. Rather, two extraneous events totally beyond his intent and control occurred after

he had effected sales of the long-term certificates of deposit to the investors: (1) interest rates increased (an event not reasonably foreseeable) causing a decline in the market values, which in turn resulted in "unrealized" or "paper" losses and (2) Magna Investments voluntarily chose to realize those "losses" by selling the instruments for market value. Accordingly, Rhodes claims that the money paid by Magna Investments to reimburse the 240 investors who received unrequested investments should not be counted in calculating the amount of loss for purposes of determining his adjusted offense level.

The Court finds that the proper amount of loss attributable to Rhodes for purposes of calculating his adjusted offense level is $1,104,557.39 as set forth in the PSR. U.S.S.G. § 2F1.1(b)(1)(L). The United States Court of Appeals for the Seventh Circuit has held:

> Under § 2F1.1(b)(1), the defendant's offense level is increased incrementally based on the amount of loss caused by the fraud. Application Note 3 to § 2F1.1 provides guidance as to how the loss caused must be calculated, stating: "For the purpose of subsection (b)(1), the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information ... The offender's gain from committing the fraud is an alternative estimate that ordinarily will underestimate the loss." U.S.S.G. § 2F1.1, Comment (Note 8). When calculating the amount of loss attributable to the defendant's fraudulent scheme, the sentencing court is to consider all relevant conduct under § 1B1.3(a) and is not limited to loss caused by the offense of conviction. United States v. Sykes, 7 F.3d 1331, 1335–36 (7th Cir.1993). "Relevant conduct," in turn, is defined as "all acts and omissions committed ... or willfully caused by the defendant ...

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1)(A).

*United States v. O'Brien,* 119 F.3d 523, 534 (7th Cir.1997).

■ Defendant's first argument (that the money lost by the unrequested investors should not be considered as part of relevant conduct) misses the mark. U.S.S.G. § 1B1.3(a)(2) provides that relevant conduct includes "all acts and omissions described in subdivision (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction...." *Id.* Contrary to Rhodes' apparent belief, he has not been charged with, nor has he been convicted of, embezzlement or theft by deception. Rather, Rhodes pleaded guilty to the offense of mail fraud in violation of 18 U.S.C. § 1341.

Thus, the focus on Rhodes' "relevant conduct" centers upon whether or not his other activities should be considered to be part of a common scheme or plan or part of the same course of conduct as his mail fraud conviction. The focus is not, as Rhodes would like it, upon whether the actions he took in directly embezzling funds from investors-such as forging signatures and manipulating documents-are similar to the misrepresentations he made to the investors to whom he provided investments which they had not requested.

When the inquiry is properly framed, the answer to the question of whether Rhodes' actions with regard to the 240 investors who received unrequested investments should be considered relevant conduct under U.S.S.G. § 1B1.3 is easily answered in the affirmative. Initially, the Court notes that, had Rhodes been con-

victed of all six Counts charged in the Indictment, those Counts would have been grouped together for sentencing purposes pursuant to U.S.S.G. § 3D1.2(d). *See United States v. Fitzgerald*, 232 F.3d 315, 319 (2d Cir.2000)(noting that· "[b]ecause U.S.S.G. § 1B1.3(a)(2) defines relevant conduct in terms of the grouping rules of § 3D1.2(d), a good first step is to determine whether or not ... [offenses] should be grouped under § 3D1.2(d).").  This fact lends support to the conclusion that Rhodes' actions regarding the 240 unrequested investment customers should be considered to be relevant conduct.

Furthermore, commentary note 9(A) to U.S.S.G. § 1B1.3 provides that in order "[f]or two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi*." *Id.* Here, there were common victims—Magna Bank and Magna Investments investors/customers; a common purpose-defrauding investors for personal gain in order to pay for his high monthly living expenses; and a similar *modus operandi*—use of the mails to facilitate his crimes. *See United States v. Palomba*, 31 F.3d 1456, 1465 n. 8 (9th Cir.1994) (holding that the defendant's "separately charged transmittals by mail and facsimile were roughly contemporaneous events, constituted essentially similar *modus operandi*, and were sent in furtherance of the same criminal objective.  Given this nexus between the wire fraud counts on which [the defendant] was properly convicted and the mail fraud counts, the three criteria for 'relevant conduct' appear to have been met.").  Thus, contrary to Rhodes' argument, the Court believes that his dealings with the 240 unrequested investment victims constitute relevant conduct because his actions toward them were part of a common scheme or plan to defraud investors for personal gain and to use the mail in order to accomplish this goal.  U.S.S.G. § 1B1.3.

However, even if the Court were to agree that Rhodes' actions were not part of a common scheme or plan, his dealings with the six direct embezzlement victims as compared to that of the 240 unrequested investment victims certainly would have to be classified as being part of the same course of conduct.  Commentary note 9(B) to U.S.S.G. § 1B1.3 provides:

> Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses.  Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses.

*Id.*

Here, the offenses are strikingly similar.  In his position as a registered representative or broker for Magna Investments, Rhodes, over a two year period of time, defrauded investors for personal financial gain, used his position of trust (more on that *infra*) in order to conceal and to perpetuate his fraud, and used the mail and/or wires in order to accomplish this goal.

Perhaps most tellingly, in his sentencing commentary, Rhodes admits that two of the investors (Roy Bertelli and Evelyn Wright) fell into both categories of victims: Rhodes directly embezzled money from

them, and he invested their money in programs which they had not requested. Therefore, Rhodes' conduct toward the two "types" of victims, obviously, bears some relation to one another.

Moreover, in the written plea agreement which both he and his counsel signed, Rhodes admitted that between October 1997 and July 1999, he knowingly misdirected funds that customers entrusted to him and to Magna in order to obtain more money for himself. Rhodes also admitted that his scheme involved two components (*i.e.*, direct embezzlement of customer funds and giving customers unrequested investments). Thus, Rhodes has admitted that his scheme had two components with the same goal of defrauding Magna Investments customers.

In addition, Rhodes' count of conviction (Count IV) includes elements of both the embezzlement and the unrequested investment parts of his mail fraud scheme. Therefore, the Court finds that the PSR properly calculated Rhodes' amount of loss, including relevant conduct.[4]

■ As for his second argument, the Court finds it too to be unavailing. The Seventh Circuit has explained:

Mail fraud and wire fraud offenses fall under U.S.S.G. § 2F1.1, which establishes a base offense level of 6, and then requires that level to be increased depending on the amount of the loss involved. Application Note 8 discusses the way in which loss should be calculated, incorporating by reference the methodology set forth in U.S.S.G. § 2B1.1 (the guideline for larceny, embezzlement, and other forms of theft). That Application Note states that "[a]s in theft cases, loss is the value of the

money, property, or services unlawfully taken. . . ." It then explains that "[c]onsistent with the provisions of § 2X1.1 (Attempt, Solicitation, or Conspiracy), if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss."

*United States v. Lorefice*, 192 F.3d 647, 654 (7th Cir.1999); *see United States v. Lauer*, 148 F.3d 766, 767 (7th Cir.1998)(noting that "[l]oss is defined as either the actual or the intended loss— whichever is greater.").

Here, the investors suffered an actual loss of $1,104,557.39 because that is the amount of money Magna Investments had to dole out in order to make its customers whole as a result of Rhodes' fraud. This amount also represents the intended loss which the Seventh Circuit defines as "the amount that the defendant placed at risk by misappropriating money or other property." *Id.* The fact that Rhodes may not have intended to cause a loss of over a million dollars is irrelevant; in fact, he probably intended just the opposite. Nevertheless, the loss was an intended consequence of Rhodes' fraud. *Id.* at 767–78 (holding that it "is the same sense in which the author of a *Ponzi* scheme might not intend that any of his investors lose anything—might intend that the scheme continue until the end of the world, in which event there would be no losers. Likewise an embezzler might not intend to impose a loss on his employer, might instead intend to use the money to gamble and win and thus be able to replace every penny he had taken. Suppose that he is caught before he has a chance to gamble with any of the money, and every cent is recovered. He is nevertheless an embezzler to the full ex-

---

4. In essence, Rhodes is attempting to limit his sentencing liability to the amount of loss contained within the mail fraud count to which he pleaded guilty. This he cannot do under the Sentencing Guidelines.

tent of the amount he took, no matter how golden his intentions or happy the consequences.").

More importantly for Rhodes' interest rate fluctuation argument, the Seventh Circuit has opined that "future events that are beyond the defendant's control do *not* affect his intent." *Lorefice*, 192 F.3d at 655, *citing United States v. Bonanno*, 146 F.3d 502, 510 (7th Cir.1998) (emphasis added). In any event, the Seventh Circuit instructs that the time to take into account the economic realities of the defendant's conduct is in considering a request for a downward departure. *United States v. Stockheimer*, 157 F.3d 1082, 1089 (7th Cir. 1998); *Bonanno*, 146 F.3d at 510; *United States v. Downs*, 123 F.3d 637, 643–44 (7th Cir.1997).

Finally, as for Rhodes' policy argument that the fluctuation in interest rates should not constitute the driving force for his sentence, the Court believes that Rhodes, rather than the victims, should bear the risk of forces beyond his control. The victims came to Rhodes and asked him to place their money in a short-term, relatively risk free investment, and he gave them a long-term, higher-risk investment in order to receive a greater profit for himself. *See* U.S.S.G. § 2F1.1, comment., (n. 8(a))(discussing calculating the amount of loss in product substitution cases). Thus, to the extent that the interest rates have come into play in calculating the amount of loss, they have done so due to Rhodes' own conduct.

As for his third argument, the Court, likewise, rejects it. Magna Investments should be lauded, not punished, for stepping up to the plate and making its customers whole. Contrary to Rhodes' argument, the Court believes that an argument could be made that Magna Investments has a legal obligation to reimburse its customers based upon its agent's (Defendant) fraudulent activity pursuant to the doctrine of *respondeat superior*.[5] All that Magna Investments did, in effect, through its reimbursements is to reduce the number of victims from approximately 240 to 1.

Furthermore, "[t]he fact that the victims have been able to recover ... their loss after the discovery of the fraud does not diminish [the defendant's] culpability and responsibility for purposes of sentencing." *United States v. Janusz*, 135 F.3d 1319, 1324 (10th Cir.1998); *see Downs*, 123 F.3d at 643–44 (rejecting the argument that the amount of loss calculation should be reduced by post-discovery restitution); *see also United States v. Wilson*, 980 F.2d 259, 261–62 (4th Cir.1992)(holding that the amount of loss under U.S.S.G. § 2F1.1 includes amounts that the victim ultimately recovers from a third party guarantor). As United States District Judge Charles Norgle recently opined:

> Loss calculation analysis with its graduated punishment scheme properly focuses on the objective financial risk to victims caused by the defendant's criminal conduct, without consideration of third party guarantees or that the full exposure of risk did not come to pass. That a victim ... was able to mitigate its losses through the good faith performance of a third party guarantor is an event that does not inure to the benefit of the perpetrator of the fraud. To that end, the defendant is not entitled to a lower loss calculation because the victim of the defendant's fraud lessened its "bottom line" losses through third party

---

5. All that paragraph 34 of the parties' stipulation says is that Magna Investments was not under a legal compulsion to reimburse investors which the Court interprets as under no court order to do so *yet*.

guarantees or other agreements that do not involve the defendant.

*United States v. Lane,* 194 F.Supp.2d 758, 772 (N.D.Ill.2002)(internal citations omitted). Accordingly, the Court finds that the PSR correctly calculates the amount of loss attributable to Rhodes for purposes of calculating his adjusted offense level, and his objections to paragraphs 105, 106, 111, & 112 are denied.

### C. *Paragraphs 23, 24, 30, 31, 63, 70, & 71*

Defendant objects to paragraphs 23, 24, 30, 31, 63, 70, and 71 which calculate the amount of loss at $150,282.00 for the six victims from whom he directly embezzled funds. Rhodes argues that he should only be held accountable for $31,122.00 because of the reimbursements which he has made to these victims. Rhodes asserts that these paragraphs' implication that the $119,160.00 in reimbursement payments were made with funds from illegitimate sources is baseless and without any evidentiary support, and thus, he should receive the additional reduction in the amount of loss calculation for the reimbursement payments which he has made.

However, even if the Court were to make the reduction which Rhodes requests, it would not affect his Sentencing Guideline range because the Court has, *supra,* found that the losses suffered by the 240 victims who received investments which they had not requested (and which Magna Investments has subsequently reimbursed) constitute relevant conduct for purposes of determining the amount of loss for which Rhodes should be held accountable for sentencing purposes. As such, even if the Court were to make the reduction, Rhodes' amount of loss would still be more than $800,000.00. Accordingly, because Rhodes' objections to paragraphs 23, 24, 30, 31, 63, 70, and 71 do not affect his sentencing, the Court declines to make a factual finding on those objections pursuant to Federal Rule of Criminal Procedure 32(c)(1).

### D. *Paragraph 115*

■ Rhodes next objects to paragraph 115 wherein he receives a two level enhancement, pursuant to U.S.S.G. § 3B1.3, for abusing a position of trust. Rhodes argues that on June 17, 1998, Magna Investments notified the National Association of Securities Dealers that it had severely reprimanded Rhodes and that it had placed him under more rigorous supervision. Rhodes claims that this supervision rendered his functions with Magna Investments comparable to that of a bank teller or a similar position not characterized by the managerial-type discretion necessary in order to receive an enhancement under the Sentencing Guidelines for abusing a position of trust. Rhodes contends that there is no evidence to suggest that he held himself out to be an experienced financial advisor in order to gain any particular victim's confidence or trust and that most of the victims had a pre-existing relationship with Magna Bank and/or Magna Investments prior to dealing with him.

In fact, Rhodes claims that he had no more discretionary authority than a bank teller. Finally, Rhodes asserts that there is no evidence that he possessed any broad discretion to act upon the victims' behalf. Accordingly, Rhodes objects to the two level enhancement for abusing a position of trust.

The Seventh Circuit has explained:

In order for the increase [for abusing a position of trust] to be appropriate, the government must demonstrate that "(1) the defendant occupied a position of trust; and (2) the defendant's abuse of the position of trust significantly facilitated the commission of the offense."

*United States v. Davuluri,* 239 F.3d 902, 908 (7th Cir.2001).... [T]he "sentencing court must look beyond formal labels to the relationship between the victim and the defendant and the responsibility entrusted by the victim to the defendant." *Davuluri,* 239 F.3d at 908. In other words, whether [a defendant] occupied a position of trust turns upon whether she had "access or authority over [other persons'] valuable things." *Strang,* 80 F.3d at 1220; *Brown,* 47 F.3d at 205.

*United States v. Frykholm,* 267 F.3d 604, 612 (7th Cir.2001).

In the instant case, the Court finds the enhancement under U.S.S.G. § 3B1.3 to be appropriate. Initially, the Court notes that the stricter scrutiny applied to Rhodes' transactions by Magna Investments did not occur until after many of the fraudulent transactions detailed in the Indictment, including the transaction outlined in his Count of conviction, had occurred. Moreover, contrary to his assertions otherwise, Rhodes was subject to little, if any, supervision prior to June 1998 (his immediate supervisor worked in St. Louis, Missouri, some 100 miles away), and the "strict scrutiny" to which Magna Investments subjected Rhodes after June 1998 was, obviously, lax at best given the fact that he continued to engage in the same sort of fraudulent activity after June 1998 which had engendered his reprimand.

In any event, the Court finds that Rhodes clearly occupied a position of trust and that his abuse of this position of trust significantly facilitated the commission of his offense. In his capacity as a licensed stock broker and a registered representative for Magna Investments, Rhodes had access to customers' Social Security numbers, their mailing addresses, their signatures, and their money; he also had access to Magna Investments' forms, accounting procedures, and investment practices.

Thus, Rhodes clearly had access or authority over others' valuable things. *See United States v. Paneras,* 222 F.3d 406, 412–13 (7th Cir.2000) (finding that the defendant held a position of trust because he held a Series 7 license, because of his knowledge of financial markets, and because of his willingness to exploit that trust); *see also United States v. Bhagavan,* 116 F.3d 189, 193 (7th Cir.1997)(finding the enhancement to be proper because the defendant "personally opened the mail, decided how each customer should pay its invoices, restricted the information available to his own office manager and accountant, and adjusted invoices to reflect his side payments."); *see also United States v. Strang,* 80 F.3d 1214, 1216, 1220 (7th Cir.1996)(holding that those who make use of the corporate form of doing business assume a fiduciary duty and, thus, occupy a position of trust).

Moreover, Rhodes' access to these "valuable things" significantly facilitated his crime as he was able to transfer funds using his victims' forged signatures and Social Security numbers, and he was able to have statements and other financial documents which may have alerted his victims to the fraud mailed to him rather than to his victims. *See United States v. Sonsalla,* 241 F.3d 904, 910 (7th Cir.2001)(upholding the abuse of a position of trust enhancement because the defendant "would not have been able to execute his fraudulent scheme had he not occupied such a 'sensitive position' with the bank. His position allowed him access to large amounts of cash, including funds customers had given him personally to deposit into their accounts."); *see also United States v. Stewart,* 33 F.3d 764, 769 (7th Cir.1994)(affirming the enhancement because the defendant, a licensed insurance broker, mailed communications to clients and others containing false representations that concealed his conversion of

clients' funds); *see also United States v. Dion*, · 32 F.3d 1147, 1150 (7th Cir.1994)(upholding the enhancement because defendant, based upon his position at the bank, was able to misapply funds and conceal the funds' location by re-characterizing transactions); *see also United States v. Christiansen*, 958 F.2d 285, 288 (9th Cir.1992)(affirming the enhancement because defendant's position allowed her to conceal her theft for an extended period of time). As for six of his victims, they trusted Rhodes to invest their money for them, and he did not; for 240 victims, they trusted him to invest their money as requested, and he did not. Therefore, the Court believes that Rhodes fits comfortably within the Sentencing Guideline's definition of one who abuses a position of trust, and therefore, his objection to Paragraph 115 is denied.

### E. *Paragraphs 170, 171, & 172*

Rhodes also objects to paragraphs 170, 171, and 172 which establish the amount of restitution owed by him to Magna Investments to be $1,104,557.39. Rhodes argues that he did not actually "cause" that amount of loss; rather, he blames the loss, if any, upon the volatility and unpredictability of the interest rates and upon Magna Investments' desire to avoid bad publicity and civil litigation. Rhodes asserts that, because he did not receive a financial benefit any where near $1,000,000.00, he cannot be said to have been the immediate cause of the loss, and therefore, restitution in that amount is not warranted.

Furthermore, Rhodes contends that he does not possess the financial wherewithal to pay any significant amount of restitution. Rhodes claims that the PSR has ignored the provisions of his August 1, 2001, net worth statement which show first, second, and third mortgages upon his family residence which exceed its fair mar-

ket value. When these mortgages are considered, Rhodes asserts that his negative net worth becomes -$39,264.82. In addition, Rhodes argues that he cannot pay restitution in the amount established by the PSR based upon his familial commitments. Therefore, Rhodes asks the Court to impose only a minimal, if any, amount of restitution.

■ During his sentencing hearing Rhodes conceded that his financial condition is not a factor for this Court's consideration when imposing restitution, and rightfully so. Defendant's offense is one "covered by the Mandatory Victim Restitution Act (MVRA), 18 U.S.C. § 3663A, which prohibits the court from examining the defendant's ability to pay restitution." *United States v. Chay*, 281 F.3d 682, 686 (7th Cir.2002), *citing* 18 U.S.C. § 3664(f)(1)(A); *United States v. McIntosh*, 198 F.3d 995, 1003–04 (7th Cir.2000); and *United States v. Szarwark*, 168 F.3d 993 (7th Cir.1999). The only inquiry into his ability to pay which the Court must make is if it were to establish a payment schedule for the ordered restitution amount. 18 U.S.C. § 3664(f)(2)-(3); *McIntosh*, 198 F.3d at 1004; *Szarwark*, 168 F.3d at 997.

Here, however, the Court has ordered that restitution is due immediately. *See United States v. Jaroszenko*, 92 F.3d 486, 492 (7th Cir.1996)(holding that " 'immediate payment' does not mean 'immediate payment in full;' rather it means 'payment to the extent that the defendant can make it in good faith, beginning immediately.' "); *see also United States v. Ahmad*, 2 F.3d 245, 249 (7th Cir.1993) (holding that "[a] judge 'may', but need not, establish a schedule."). Thus, inquiry into Rhodes' financial condition is not necessary.

■ Furthermore, the Court has rejected, *supra*, Rhodes' argument that he did not "cause" and that Magna Investments

did not suffer a loss in the amount of $1,104, 557.39. Restitution is not limited to Rhodes' personal gain. *Chay*, 281 F.3d at 686. Rather, "restitution tracks 'the recovery to which [the victim] would have been entitled in a civil suit against the criminal.'" *United States v. Behrman*, 235 F.3d 1049, 1052 (7th Cir.2000), *quoting United States v. Martin*, 195 F.3d 961, 968 (7th Cir.1999). In this case, there is a causal connection between Rhodes' fraudulent conduct and the restitution amount stated in the PSR.[6] Accordingly, Rhodes' objections to paragraphs 170, 171, and 172 are denied.

### F. *Downward Departure*

■ Finally, Rhodes asks the Court for a downward departure because the amount of loss over-represents the seriousness of his crime. Rhodes reiterates his argument that his sentence should not depend upon the fortuity of the interest rate fluctuations because it would make one of the Sentencing Guidelines' purposes (*i.e.*, uniformity) virtually unattainable. Moreover, as to the 240 victims who received investments which they had not requested, Rhodes asserts that he did not personally derive a financial benefit anywhere near the amount of loss figure calculated in the PSR; rather, he simply earned a small commission per transaction in the ordinary course of business. Accordingly, Rhodes claims that because he did not personally benefit in an amount equal to the amount of loss, the Court should grant him a downward departure because the amount of loss over-represents the seriousness of his crime.

The Court clearly possesses the authority to grant Rhodes the downward depar-

ture which he seeks if it finds that the amount of loss significantly overstates the seriousness of his conduct. U.S.S.G. § 2F1.1, comment. (n. 8(b)); *United States v. Saunders*, 129 F.3d 925, 933 (7th Cir. 1997). However, the Court declines to so exercise its discretion because it does not believe that the amount of loss significantly overstates the seriousness of his conduct. Rhodes preyed upon elderly investors by embezzling funds which they had provided to him for investment. For those investors for whom he actually invested money, Rhodes invested in financial plans which would most benefit him and not in programs which the victims had requested or, in some cases, would be suitable for them.[7] Rhodes took these actions in order to fuel and to fund his high personal monthly expenses. Thus, the Court does not believe a downward departure is warranted under the facts of this case.

In fact, if a departure is warranted at all, the Court would upwardly depart. After pleading guilty, Rhodes continued to engage in shady financial dealings with next employer, and he attempted to open a line of credit without the approval of the Court in violation of his bond. Such conduct could be construed as Rhodes' failure to truly accept responsibility for his crime and could result in the Court revoking his three level reduction for acceptance of responsibility. *See* U.S.S.G. § 3E1.1, comment. n. 1(b)(providing that "[i]n determining whether a defendant qualifies [for the acceptance of responsibility decrease], appropriate considerations include ... voluntary termination or withdrawal from criminal conduct"); *see also* U.S.S.G. § 3E1.1, comment. (n. 3)(providing that "this evidence may be outweighed by conduct of

---

6. Magna Investments is clearly a victim as that term is used in the Mandatory Victim Restitution Act. 18 U.S.C. § 3664(j)(1).

7. For example, Rhodes invested the funds of an 89 year old woman and a 90 year old woman in variable annuities—investments which are unsuitable for persons of these ages.

the defendant that is inconsistent with such acceptance of responsibility."); *see also United States v. Rhodes,* 894 F.Supp. 1, 5 (D.D.C.1995)(holding that an acceptance of responsibility "reduction is unwarranted because, following a Court appearance in this case, the Rhodes was arrested on February 10, 1995 for the same conduct for which he was convicted.").

Nevertheless, Rhodes has pleaded guilty, has saved judicial resources, prosecutorial resources, and tax payer money, and therefore, the Court will not remove his acceptance of responsibility decrease. However, the Court declines to downward depart from Rhodes' sentence because it does not believe that the amount of loss attributed to him for sentencing purposes significantly overstates the seriousness of his conduct.

*Ergo,* Rhodes's objections to the PSR are DENIED. Therefore, Rhodes has an adjusted offense level of 20 and a criminal history within category I, yielding a sentencing range of 33 to 41 months of imprisonment.

Accordingly, Bruce W. Rhodes is hereby sentenced to a term of imprisonment of 37 months to be followed by a 3 year term of supervised release upon being discharged from the Bureau of Prisons. Rhodes is ordered to pay a special assessment of $100.00 and to pay restitution in the amount of $1,104,557.39 to Magna Investments, Inc., Attn: Kent Knickmeyer, 1 Firststar Plaza, St. Louis, Missouri, 63101, immediately.[8] No fine is ordered. Finally, the Court recommends to the Bureau of Prisons that Rhodes be placed in a facility as close to Springfield, Illinois, as possible.

---

8. In light of the amount of Defendant's restitution and his financial circumstances, the Court waives interest on the amount of restitution imposed.